UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAVEN MALCORVIAN, | ) |
| Plaintiff, | ) |
| | ) No. 23-cv-3987 |
| v. | ) |
| | ) Judge April M. Perry |
| COOK COUNTY, d/b/a COOK COUNTY MEDICAL EXAMINER'S OFFICE, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Raven Malcorvian ("Plaintiff") brings this action against Cook County ("Defendant"), alleging a violation of the Americans with Disabilities Act of 1990 ("ADA"). Doc. 32. Specifically, Plaintiff alleges that Defendant failed to accommodate Plaintiff's disability after having offered her a job as a Forensic Technician at the Cook County Medical Examiner's Office ("CCMEO"). *Id.* This opinion resolves Defendant's amended motion for summary judgment. Doc. 91.[1] For the following reasons, Defendant's motion for summary judgment is granted.

**BACKGROUND**

The CCMEO operates twenty-four hours a day, seven days a week. Doc. 103 at 1. In September 2019, the CCMEO created the role of Forensic Technician by merging the positions of autopsy technician, toxicologist, and intake attendant. *Id.* at 2. Forensic Technicians are assigned to one of three shifts: day shift (7:00 a.m. to 3:00 p.m.), afternoon shift (3:00 p.m. to 11:00 p.m.) or evening shift (11:00 p.m. to 7:00 a.m.). *Id.* at 9. Shifts are rotated on a quarterly

---

[1] Defendant's previous motions for summary judgment are denied as moot. Doc. 79; Doc. 80.

basis. *Id*. Certain functions, like autopsies, toxicology testing, and training, only occur during the day shift. *Id.* at 3, 9.

According to the written job description, Forensic Technicians have the following typical duties:

> Receives transported bodies by police and other agencies, identifies bodies, attaches identification markers and transports bodies to refrigerated storage area.
>
> Examines bodies for personal effects, conducts inventory of all clothing and personal property, completes proper inventory sheet, places clothes in bags for police and funeral directors to pick up and secures items in the presence of the police or other transporter.
>
> Prepares records for all bodies received, logs any information concerning bodies received/release via case management system. Maintains pertinent and confidential reports and files electronically and/or paper format.
>
> Transports body to and from autopsy rooms for other departments (e.g. Radiology, Photography, Investigations).
>
> Under supervision of examining pathologist, places bodies on autopsy tray, undresses and cleans bodies prior to examination, measures and weighs bodies and organs assists with taking radiographs and photographs of bodies.
>
> Assists with autopsies as directed under supervision of examining pathologist. Opens bodies and removes organs or organ blocks by making Y-incision using surgical tools. Assist in recovering bullets and other evidence from bodies, weigh and record organs, places organs in plastic bag and places plastic bag inside body cavity. Closes bodies by sewing incision and prepares fingerprint cards.
>
> Assists in obtaining specimens for toxicologic and bacteriologic studies. Prepares specimens for medical consultants and DNA analysis (i.e. stock tissue, brain, heart and bones). Prepares specimens in pre-labeled specimen containers. Stores and disposes specimens and maintains thorough records of disposed specimens.
>
> Inventories, labels and places specimens in the refrigerator/freezer per protocols. Registers specimens and assigns tox orders to specimens reflecting pathologist orders and prepares and transports specimens when needed for send out to contracted/other labs.
>
> Run carbon monoxide (CO) analysis and report results.
>
> Record freezer and refrigerator temperature and understand proper temperature ranges.
>
> Completes death certificates and related forms upon receipt from the forensic pathologists. Enters Death certificate information into Illinois Department of Public Health Vital Records Electronic Death registry when required.

>Processes visual identification by next of kin on a computer monitor.
>
>Prepares bodies for County burial by placing the deceased in the burial shell, attaching identifying tag to burial shell and securing lid.
>
>Releases bodies to family designated funeral directors.
>
>Performs casework review/peer review for analyses.
>
>Assists the compliance officer to generate accurate analytical results with appropriate statistical data and assists with proficiency testing and office accreditation.
>
>Responds to all telephone inquiries from general public, police and undertakers and refers calls to appropriate parties in the Medical Examiner's Office.
>
>Performs miscellaneous duties such as unloading trucks and transporting supplies to and from work and storage areas, preparing blood cards and other administrative functions.
>
>Maintenance and upkeep of specimen storage areas, other storage areas and autopsy rooms; and maintenance, upkeep, cleaning, sterilization, and securing of laboratory and autopsy equipment.
>
>Performs other duties as assigned.

Doc. 91-5. The job description also includes the bolded notation that:

>The duties listed are not set for the purposes of limiting the assignment of work. They are not to be construed as a complete list of the many duties normally to be performed under a job title or those to be performed temporarily outside an employee's normal line of work.

*Id.*

Although not part of the written job description, Defendant contends that Forensic Technicians also are responsible for:

>(a) completing new employee Forensic Technician training, which can last for up to six months and only takes place during the day shift (7:00 am and 3:00 pm);
>
>(b) maintaining conformance with accreditations by National Association of Medical Examiners (NAME); ANSI National Accreditation Board (ANAB); and International Organization for Standardization (ISO), which requires Forensic Technicians to competently perform 10 autopsies per year;
>
>***

3

>   (h) coordinating the notification and identification of decedents by next of kin, which includes greeting next of kin, admitting them to a private non-secure area, and assisting them with the identification process through viewing terminals;
>
>   (i) transporting decedents to and from refrigerated areas for x-ray or autopsy;
>
>   \*\*\*
>
>   (k) receiving toxicology lab materials at the dock, unloading trucks from the open-air dock station, transporting them to the toxicology lab and stocking all such materials;
>
>   (l) assessing the transport and delivery condition of decedents in vehicles, receptacles, and containers arriving at the docking station;
>
>   (m) coordinating processions for law enforcement fatalities to and from the facility;
>
>   (n) assisting with exhumations at burial sites;
>
>   \*\*\*
>
>   (q) transporting specimens, including cultures and organs, to Rush Hospital daily for testing;
>
>   (r) attending mass casualty training and conducting assigned duties during mass fatality response at an incident site; and
>
>   (s) working mandated rotating shifts, including holidays and weekends, to ensure 24/7 coverage.

Doc. 91-2 ¶ 5.

On October 22, 2019, Plaintiff applied for the position of Forensic Technician at the CCMEO. Doc. 91-16 ¶ 5. Plaintiff satisfactorily responded to three eligibility questions within the job application, one of which was that she was "able to work rotating shifts to provide 24/7 coverage including holidays and weekends." Doc. 91-16 ¶¶ 5-6. Plaintiff was subsequently interviewed, and Defendant offered Plaintiff the position on December 10, 2019. Doc. 103 at 11. The employment offer was contingent upon a successful background check, drug screen, and medical examination. *Id*.

On December 17, 2019, Plaintiff informed Defendant that she had a photosensitivity disorder requiring accommodation. Doc. 91-16 ¶ 7. Specifically, Plaintiff suffers from chronic,

recuring dermatitis and severe photo allergenic sensitivity. Doc. 32 ¶ 36. When exposed to natural light, Plaintiff experiences anaphylactic shock, extreme pain, burning skin, fainting, and body temperatures as high as 109 degrees. *Id.* ¶ 10.

In response to Plaintiff's request for an accommodation, Defendant emailed Plaintiff an ADA accommodation request form and a medical questionnaire to be completed by a physician. *Id.* ¶ 8.

Plaintiff completed the accommodation request form on December 27, 2019. Doc. 91-14. After identifying her photosensitivity impairment, Plaintiff included the following responses:

> **Q:** What, if any, job function(s) are you having difficulty performing as a result of your impairment?
> **A:** I just need work areas either with no windows or if there are windows they have to be covered/sealed off from having any sunlight coming through. I will have to release bodies I don't know what that area looks like but if any sunlight is in it I can always wear my PPE if the area has sunlight exposure that can't be covered. Any area I walk through I could always wear my PPE but it would be better to have no sunlight/windows or to have the windows covered. This is an easy accommodation to make and wouldn't cost much.
>
> \*\*\*
>
> **Q:** What specific accommodation are you requesting? Please describe in detail.
> **A:** To have workspace windows to be covered from light. I don't know what the work space looks like. If the body receiving area is a garage I can always wear my PPE to access it and use it to let people in/out. Signs are also good to make awareness of my skin issues.

*Id.* Plaintiff's physician, Dr. Ayesha Nasir, completed the medical questionnaire on December 27, 2019. Doc. 91-16 ¶ 9; Doc. 91-13. Dr. Nasir described Plaintiff's impairment as:

> Diagnosed with chronic recurring dermatitis due to solar radiation exposure. Due to her condition she would need to avoid all sources of natural light in the work place. This includes windows, entry doors with windows, hallways and any common areas with natural light exposure, which needs to be secured. These accommodations are necessary to avoid symptoms such as burning of the skin, blisters, lesions of skin, syncope, headaches, nose bleeds and possible long term sickness.

Doc. 91-13. Dr. Nasir also indicated that Plaintiff's major life activities were limited as to "[r]egular activities during the daytime – needs to wear PPE if out during the day." *Id.* When

5

prompted to recommend specific accommodations, Dr. Nasir responded "[a]ny work area with windows should be covered so no sunlight comes through." *Id.*

On January 15, 2020, EEO Officer Simone McNeil emailed the "Determination Notice" to Plaintiff, which denied her request for window and door coverings, but allowed her to wear PPE in "any and all areas of the Medical Examiner's Offices when exposed to natural light." Doc. 91-16 ¶ 11; Doc. 91-17 at 25-26. Plaintiff followed up concerning the accommodation determination on January 21, 2020, explaining that:

> I want to reiterate that yes, I can wear my PPE, I have to during the day in exposed areas, but not for extended periods of time, which is what my doctor should've elaborated. Wearing my gear is physically and mentally draining, difficult to breathe in, and a hardship upon myself that is why if I am working in an exposed area it should be brief. I cannot be in the tech office area for my entire shift in my PPE, which is why an accommodation there is needed.

Doc. 91-17 at 28-29. On January 24, 2020, McNeil responded that the determination notice would not be changed and that Defendant could also provide Plaintiff with a fan. *Id.* McNeil also told Plaintiff that she needed to accept the position along with the terms of the reasonable accommodation by January 29, 2020, or the offer would be withdrawn. *Id.* Plaintiff responded on January 27, 2020, claiming that Defendant's "facility doesn't want to accommodate me," that she intended to escalate the matter "with a proper ADA office and the EEOC," that she was "still willing to work with this office if they accommodate me," and "[i]f I don't hear back from you I assume you don't care to resolve this matter with me." *Id.* at 27.

On February 4, 2020, McNeil sent an email to the Executive Officer of the CCMEO telling him that Plaintiff "has not complied by informing us of her decision; it has been over five days and we should move on." Doc. 103-11.

## LEGAL STANDARD

Summary judgment is proper when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. FED. R. CIV. P.

6

56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, the party that bears the burden of proof must present facts showing there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in her favor, this obligation does not extend to drawing inferences that are supported by only speculation or conjecture. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## ANALYSIS

Plaintiff brings a failure to accommodate claim under the ADA. Doc. 32. The ADA prohibits discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). The ADA thus provides "employment protections to individuals with disabilities who can perform the essential functions of a job so long as their employer makes a reasonable accommodation for them." *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 642 (7th Cir. 2023). To establish a failure to accommodate claim, a plaintiff "must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Schoper v. Bd. of Trs. of W. Illinois Univ.*, 119 F.4th 527, 532 (7th Cir. 2024).

7

There is no dispute that Plaintiff has a disability and that Defendant was aware of that disability. Still, Defendant argues that it is entitled to summary judgment because Plaintiff cannot show that she was a qualified individual under the ADA and because Plaintiff cannot prove that Defendant failed to reasonably accommodate her disability.

The Court begins with Defendant's argument that Plaintiff is not a qualified individual. To determine whether someone is a qualified individual, courts "follow a two-step process, evaluating first whether the individual satisfies the necessary prerequisites of the position and then considering whether the individual can perform the essential functions of the position with or without a reasonable accommodation." *Leibas v. Dart*, 108 F.4th 1021, 1025 (7th Cir. 2024). Prerequisites include things like "possessing the appropriate educational background, employment experience, skills, licenses, etc." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). The Court reviews the record in the light most favorable to Plaintiff, "but it is up to [Plaintiff] to provide sufficient evidence to create a genuine dispute of material fact that she can perform the essential functions" of the job. *Leibas*, 108 F.4th at 1025; *see also Bombard*, 92 F.3d at 563 (discussing that Plaintiff bears the burden of proof in such instances and "must be able to show that [she] is a 'qualified individual with a disability' in order to successfully prosecute an ADA claim.").

First, Defendant argues that Plaintiff was not a qualified individual because she never completed the required pre-employment screening of a background check, drug screen, and medical examination. While it is undisputed that Plaintiff did not complete the pre-employment screening, the parties dispute who was responsible for that failure. Plaintiff argues that her January 27 email stating "I am still willing to work with this office if they accommodate me," Doc. 91-17 at 27, indicated a desire to continue with the screening process, and that Defendant's revocation of the job offer is the reason the screening did not occur. Defendant argues that

8

Plaintiff had from the December 10 offer until January 29 to complete the screening, and that the failure to do so in a timely manner is Plaintiff's fault. Viewing the facts in the light most favorable to Plaintiff, it was Defendant's decision to revoke Plaintiff's job offer before Plaintiff conducted the employment screening. There is no indication in the record that Plaintiff was told before January 24 that the screening must occur within a certain timeframe or that her job offer was being held open until a certain date. Nor is there any indication in the record that Plaintiff would have been unable to pass the screening if the job offer had not been revoked. Given that the parties were engaged in ongoing discussions regarding whether Plaintiff's disability could be accommodated, and that Defendant then made its employment offer contingent on Plaintiff accepting Defendant's first (and only) accommodation offer, the Court cannot find that lack of employment screening is attributable to Plaintiff. Thus, the Court does not believe it appropriate to find that the lack of employment screening rendered Plaintiff unqualified. A reasonable jury could infer that Plaintiff satisfied the prerequisites for the Forensic Technician position given that Defendant offered her the job after a full application and interview process.

  Defendant next argues that Plaintiff was not a qualified individual because no reasonable accommodation would have allowed her to perform the essential functions of the position. Defendant maintains that the Forensic Technician position involves numerous tasks with unavoidable exposure to natural light. Specifically, Defendant notes that on a daily basis Forensic Technicians are expected to walk two blocks to Rush Hospital to transport specimens, move bodies to and from outdoor coolers, and greet and escort visitors in the intake and receiving area which has doors that open hundreds of times a day. Doc. 91-2 ¶¶ 5-8. Defendant also notes that Forensic Technicians are expected assist with exhumations at burial sites once or twice a year and train for on-site response to mass casualty events once a year. Doc. 91-6 at 24-25. In the event of a mass casualty event, every Forensic Technician would be expected to

9

respond and assist as needed. *Id*. Mass casualty events include everything from airline crashes to mass shootings to COVID body retrieval and require that Forensic Examiners be able to work 24/7. *Id.* at 25, 33, 36.

Notably, Plaintiff does not argue in her responsive brief that any of the above tasks are not essential functions of a Forensic Technician at CCMEO. While Plaintiff did object to Defendant's proposed statement of facts listing these job duties as essential, Plaintiff did not present any of her own contradictory evidence. Doc. 103 at 3-5, 8. Rather, Plaintiff stated that Defendant's evidence was vague, speculative, and was not listed in the written job description. The Court acknowledges that some of these duties are not in Forensic Technician job description, but every essential function does not need to be in a written job description. *See* 29 C.F.R. § 1630.2(n)(3) (listing a written job description as one of seven ways to show that a function is essential). Plaintiff's written job description stated that Forensic Technicians would "[p]erform[] other duties as assigned" and that the list "is not to be construed as a complete list of the many duties normally to be performed." Doc. 91-5. Moreover, Dr. Ponni Arunkumar, the Chief Medical Examiner for the CCMEO, testified about these functions, including that the Forensic Technicians needed to train for and respond to mass fatality events at incident sites and perform exhumations. Doc. 91-6 at 24. The Court does not agree that any of this testimony was vague or speculative. Summary judgment is the "put up or shut up" stage of litigation. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024). If Plaintiff wanted to present a genuine dispute of fact as to whether Defendant's stated job duties were essential, Plaintiff should have cited to particular materials in the record showing a factual dispute, *see* Fed. R. Civ. P. 56(c), or argued the issue as a matter of law in her brief opposing summary judgment, s*ee Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a

10

person waives an argument by failing to make it before the district court.") Plaintiff did not do either.

Instead of arguing about the essential functions of the job, Plaintiff's brief focuses on the argument that she would have been able to perform all of the job duties of a Forensic Technician with reasonable accommodations such as having the windows covered and wearing PPE. Plaintiff further asserts that Defendant refused to legitimately engage in the interactive process by only offering her the accommodation of wearing her PPE and unilaterally denying her request for window coverings. Finally, Plaintiff argues that Defendant should have allowed her to work the night shift, which would have "all but eliminated the risk of Plaintiff coming into contact with natural sunlight." Doc. 102 at 14.

Ultimately, the Court finds that Plaintiff has not provided evidence to demonstrate that she could have performed the essential functions of the job with or without an accommodation. While the Court is troubled by Defendant's refusal to cover the windows in Plaintiff's workspace, the undisputed fact remains that Forensic Technicians were required to leave their workspaces frequently.[2] The only reasonable accommodation that Plaintiff has suggested for these outings is that she could wear PPE. However, Plaintiff has also stated that she cannot wear PPE "for extended periods of time," that her time in her PPE must be "brief," that "her PPE is only meant 'to go from A to B,'" and that "even after 10 minutes she becomes pretty uncomfortable." Doc. 103 at 16-17. Plaintiff believes that wearing her PPE for more than twenty minutes causes breathing problems and her temperature to dangerously increase. Doc. 91-12 at 21-24. It is therefore a reasonable inference that the PPE would be a potential accommodation for "point A to point B" tasks like transporting specimens to Rush Hospital, moving bodies to

---

[2] The Court is also troubled by Defendants' apparent lack of communication and cooperative engagement in the interactive process. That said, failure to engage in the interactive process is not an independent basis for liability under the ADA. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 480 n.1 (7th Cir. 2017).

and from outdoor coolers, and greeting and escorting visitors. However, it is not a reasonable inference that the PPE would be a viable accommodation for working at exhumations or mass casualty events. And Plaintiff does not provide any evidence to support her assertion that she could have performed these tasks, with or without an accommodation.[3] To the contrary, when asked during her deposition how long Plaintiff could wear her PPE if responding to a mass casualty event during daylight hours, Plaintiff responded "I have no idea." Doc. 91-12 at 33. It is Plaintiff's burden to demonstrate that she can perform the essential functions of the job. *See Leibas*, 108 F.4th at 1025. Testimony that she has no idea how long she would be able to work in PPE does not suffice. Because there is no evidence that a reasonable accommodation was available to allow Plaintiff to perform all of the essential functions of the Forensic Technician role, summary judgment for Defendant is appropriate. *See Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001).

      Plaintiff's argument that being assigned to the night shift would have allowed her to perform all of the essential functions of the role is not persuasive. The CCMEO night shift runs from 11:00 p.m. to 7:00 a.m., and thus during at least half of the year includes daylight hours. More importantly, working the night shift does not address the CCMEO's stated need for every Forensic Technician to be able to "provide 24/7 coverage including holidays and weekends." Doc. 91-16 ¶¶ 5-6. As already discussed, an essential feature of the Forensic Technician position was training for and responding to mass casualty events, whenever and wherever they may arise. Plaintiff has provided no explanation for how she would have been able to do so should such an event arise during daylight hours. *Cf. Tate v. Dart*, 51 F.4th 789, 797 (7th Cir. 2022) (discussing

---

[3] Plaintiff cites to two portions of the record allegedly showing that she could have assisted with the exhumation of bodies and at mass casualty events. *See* Doc. 102 at 11 (citing Doc. 103 at 19, Doc. 103 at 13). Neither citation addresses exhumation and mass casualty events. The Court has not seen any evidence to support Plaintiff's assertion in her brief that she would have been able to perform these job functions. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 285 (7th Cir. 1997) (discussing that the district court need not "scour the record in search of a genuine issue of triable fact.").

12

that requiring one employee to substitute for another is not a reasonable accommodation in a job with public safety emergency duties). Additionally, autopsies and toxicology testing only take place during the day shift, Doc. 103 at 9, which would mean that Plaintiff would not be performing those job duties if only assigned to work nights.

The Court also finds unpersuasive Plaintiff's speculation that she must be qualified for the CCMEO Forensic Technician position because she previously worked as a Forensic Autopsy Technician for the Chief Medical Examiner in Raleigh, North Carolina. Doc. 102 at 6. Aside from her own declaration that the job in North Carolina was "a substantially similar position to the one offered to [her] by the [CCMEO]," Plaintiff submits no evidence that would allow this Court to compare the roles. Doc. 103-1 ¶¶ 1-2. Given that Plaintiff never worked as a Forensic Technician at the CCMEO, her statement that the job is substantially similar to her prior one is not based on personal knowledge. *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("[U]ncorroborated, self-serving testimony, if based on personal knowledge or firsthand experience, may prevent summary judgment against the non-moving party, as such testimony can be evidence of disputed material facts. But mere conclusory allegations do not constitute evidence."). Moreover, it seems as though the Raleigh job did not include responding to mass casualty events, given that Plaintiff has no recollection of having ever been trained to perform that function. Doc. 91-12 at 33.

For these reasons, Plaintiff has failed to establish any genuine dispute of material fact as to her ability to perform the essential functions of the CCMEO's Forensic Technician role with or without reasonable accommodation. Therefore, Plaintiff cannot establish that she is a qualified

13

individual as is necessary for her to proceed with a failure to accommodate claim under the ADA.

## CONCLUSION

Defendant's motion for summary judgment is granted.

Dated: August 1, 2025

_____
APRIL M. PERRY
United States District Judge